CRENSHAW v. STATE.

GANAWAY v. STATE.

Opinion delivered July 11, 1910.

1. PEDDLING—SALE OF STEEL RANGES.—Acts 1909, p. 292, providing that "before any person, either as owner, manufacturer or agent, shall

travel over and through any county and peddle or sell any lightning rod, steel stove range, clock, pump, buggy, carriage, or other vehicle, or either of said articles, he shall procure a license," is violated where a manufacturer of steel stove ranges employs men to travel through a county and solicit orders for such ranges and employs other men to deliver the ranges so sold, without procuring a license. (Page 468.)

2. SAME—APPLICATION OF STATUTE.—Where a nonresident manufacturer of stove ranges, without procuring a license as a peddler, employed men to travel through a county and solicit orders for their sale and delivery within this State, and shipped the ranges to fill the orders in separate packages in car load lots from another State, without the purchasers' names being designated on the packages, and separated the packages after they reached this State, and delivered them to the purchasers, the ranges not being separately appropriated to the filling of any particular order, the transactions were in violation of the peddling act of 1909. (Page 470.)

3. INTERSTATE COMMERCE—STATE REGULATION.—Acts 1909, p. 292, prohibiting peddling without license, is applicable to articles shipped from another State and peddled here, as the license is not required for the sale of goods, but for peddling them. (Page 470.)

Appeals from Union Circuit Court; *George W. Hays,* Judge; affirmed.

*Marsh & Flenniken* and *Moore, Smith & Moore,* for appellants.

The course of dealing pursued by appellants should not be construed to violate act 97 of Acts of 1909. 12 Cush. 393; 114 Mass. 267; 85 Minn. 290; 88 N. W. 984; 20 S. E. 544; 47 Fed. 539; 8 Pac. 865; 39 N. W. 191; 28 N. W. 13; 6 So. 393; 132 Ill. 380; 55 N. J. L. 522; 69 N. H. 424; 50 La. Ann. 574; 74 S. W. 31; 50 S. E. 428; 49 Pac. 373; 130 N. C. 724; 41 S. E. 785; 140 N. Y. 187; 41 Fed. 775; 57 Fed. 496. If the act must be construed so as to prohibit the course of dealing pursued by appellants, then it is unconstitutional. 120 U. S. 489; 128 U. S. 129; 135 U. S. 100; 153 U. S. 289; 185 U. S. 27; 187 U. S. 632; 203 U. S. 507; 10 So. 853; 11 S. E. 233; 84 Ga. 754; 20 S. W. 21; 43 N. E. 463; 55 S. W. 834; 47 S. E. 648; 97 N. W. 1020; 96 S. W. 914; 43 S. E. 740.

*Hal L. Norwood,* Attorney General, and *W. H. Rector,* for appellee.

The circuit court has no authority to hear and determine a case on appeal from a justice of the peace until the justice

has filed a certified transcript with the clerk of the circuit court. 5 Ark. 474; 6 Ark. 252; 9 Ark. 474; 11 Ark. 639; 73 Ark. 608; 7 Ark. 11. Jurisdiction can not be conferred by consent. 90 Ark. 198; 85 Ark. 213. The bill of exceptions fails to show upon what evidence the judgment of the circuit court was based. 70 Ark. 127; 72 Ark. 21; 74 Ark. 195; 72 Ark. 185. But, if it can be determined from the bill of exceptions what the evidence was, the judgment should be affirmed. 67 Ark. 464; 72 Ark. 185; 45 Ark. 240; 58 Ark. 134; 26 Ark. 653; 35 Ark. 220; 46 Ark. 17; 30 Ark. 527; 64 Ark. 488; 25 Ark. 503; 15 Ark. 348; 28 Ark. 5; 29 Ark. 562; 107 Ind. 502; 84 Ga. 754; 105 Ga. 457; 15 Pa. Sup. Ct. 612; 118 N. C. 328. The statute applies to the course of dealing pursued by appellant. 20 Pac. 620; 38 Wis. 428; 134 Mich. 181; 146 Mich. 443; 169 Ind. 508. The statute is constitutional. 86 Ark. 69; 83 Ark. 448; 85 Ark. 12; 143 U. S. 339; 41 Fed. 468.

*Marsh & Flenniken* and *Moore, Smith & Moore,* in reply.

The power of the circuit court to hear and determine does not depend upon the signature of a justice of the peace. 83 Ark. 517. That is no more essential than the filing of a proper affidavit for appeal. 33 Ark. 747; 46 Ark. 305; 37 Ark. 206; 60 Ark. 444.

McCULLOCH, C. J. Appellants were tried before a justice of the peace of Union County, and convicted on a charge of violating the peddling statute of 1909, which provides that "before any person, either as owner, manufacturer or agent, shall travel over and through any county and peddle or sell any lightning rod, steel stove range, clock, pump, buggy, carriage or other vehicle, or either of said articles, he shall procure a license," etc. Acts 1909, p. 292. On appeal to the circuit court they were again convicted, and appealed to this court. The case was heard on the following agreed statement of facts:

"The Wrought Iron Range Company is a corporation organized under the laws of Missouri, with its general offices located at St. Louis, Mo., in which city and State it also has a factory, at which are manufactured the ranges sold by its traveling salesmen throughout Union and other counties of Arkansas and other States of the United States.

"The manner and form in which said company is conducting its business in Union and other counties of Arkansas is as follows: R. L. Sutton, an employee of the Wrought Iron Range Company, and known as a division superintendent, has general supervision of said company's business in Union and other counties of Arkansas. Under the immediate supervision and direction of said Sutton are other employees of said company known in the business as sample men or salesmen, and two other employees of said company known in its business as deliverymen. All of said employees are paid for their services stipulated compensations by said company, and none of said employees has any financial or monetary interest in the property of said company located in Union County, or in the sales or proceeds of sales made by them in said county or elsewhere in the State of Arkansas, other than compensation hereinbefore referred to. Each of said employees of said company, known as salesmen, is furnished by said company with a sample range, sample wagon and team, and is sent into such territory in Union or other counties as may be designated by said Sutton, to solicit orders for ranges similar to the sample range exhibited to prospective purchasers. Where orders for ranges are taken by said salesmen, the purchaser signs a note or order, one-half payable in October, 1910, and the other half payable in October, 1911. Said note or order contains an express stipulation that same shall be void as against the purchaser in the event said company fails to deliver the range so ordered within sixty days from date.

"All orders so taken by said salesmen are forwarded by them to the said Sutton, who investigates the credit of said purchasers, and, if same is found satisfactory, he proceeds to have said orders filled within sixty days' limit. Such deliveries of the ranges so sold or ordered are made through or by the employees of said company hereinbefore referred to as deliverymen, each one of whom is furnished with a delivery wagon and team by said company for such purpose.

"All the sample ranges, all ranges delivered to said purchasers, all the sample wagons and teams, and all the delivery wagons and teams hereinbefore referred to, are the sole and exclusive property of said company. Under no circumstances do the employees hereinbefore referred to as salesmen, sell, or offer to sell or deliver, the sample ranges entrusted to them by

said company. Under no circumstances does any one of said salesmen deliver to purchasers the ranges, orders for which have been taken either by himself or any other of said salesmen. Under no circumstances do any of said deliverymen sell, or offer to sell, or take orders for ranges, or to deliver any ranges other than those for which orders have previously been taken by the employees hereinbefore referred to as salesmen. All ranges so owned and manufactured are shipped in carload lots to Union County, each car containing sixty separate and distinct ranges, each car being consigned by said company to itself, in care of R. L. Sutton, its employee.

"A carload of ranges was shipped from St. Louis, Mo., to El Dorado, Ark., for the purpose of filling orders previously secured by said soliciting agents or traveling salesmen. Upon the arrival of said car at El Dorado the ranges were taken from said car, loaded on said delivery wagons and delivered by said deliverymen to said purchasers in the precise shape, condition, form and packages in which they were delivered by said company to the common carrier at St. Louis, Mo. * * *

"It is further agreed by and between the State of Arkansas, through its prosecuting attorney, and the defendants herein, that E. L. Ganaway and W. W. Dennis are salesmen of the Wrought Iron Range Company, and have in Union County, Arkansas, within the last twelve months, exhibited sample ranges, and solicited and taken orders for them, and have taken notes for the same, doing all of said business in the manner hereinbefore stated. That A. C. Crenshaw and P. L. Hadler are acting as deliverymen in the employ of said Wrought Iron Range Company, and have in the manner hereinbefore set forth delivered ranges to parties in Union County, Arkansas, who had previously given orders to the said above-named salesmen within twelve months before that time.

"That all of said persons above-named are hired employees of the said Wrought Iron Range Company, and have been arrested, and that neither of said parties nor the Wrought Iron Range Company have paid any license in Union County, Arkansas."

We decided in Ex parte Byles, 93 Ark. 612, that the statute in question is valid, but it is now insisted that, as applied to the transactions set forth in the statement, it is a

burden on interstate commerce, and to that extent void. Appellant Ganaway solicited orders for ranges, and appellant Crenshaw made deliveries thereof after they were ordered and shipped to El Dorado, Ark., for delivery to the respective purchasers. They were working under the same employer, and pursuant to a plan whereby one was to solicit orders and the other to deliver the articles sold. So, if the two acts constituted an offense when performed by one person, its unlawful character would not be changed when performed by two persons, acting in concert, but both would be guilty.

The statute is directed against peddling, and undertakes to define what constitutes peddling within the meaning of the statute. This definition varies from the common-law definition of peddling, in that it is not essential that the vendor deliver his wares at the time he makes sales thereof in order to come within its terms. In the statutory definition the words "peddle" and "sell" are used synonymously, but in order to come within the terms of the statute it is essential that a sale must be by one traveling over and through the county. The statute does not reach to mere sales. In other words, one who simply brings his wares into a county and sells them does not fall within the statute. There must be added the element of traveling from place to place, over and through the county, for the purpose of selling, in order for the statute to reach to it. It should also be especially noted that the statute does not discriminate against nonresidents of the State or of any county, nor against the wares manufactured without the State. It applies to all alike which fall within the description.

Does the method in which appellants conducted business for their employer exempt them from the operation of the statute? We think not.

The opinion of the Supreme Court of the United States, delivered by Mr. Justice Gray in *Emert* v. *Missouri,* 156 U. S. 296, announces the law applicable to the case and sustains the views we express. In that case the agent of a nonresident manufacturer of sewing machines was engaged in peddling machines in Missouri without obtaining a license, as required by the statutes of that State. He asserted his right to sell free of license, on the ground that the transaction constituted inter-

state commerce. All of the prior decisions of that court are reviewed; and the following conclusions announced:

"The statute in question is not part of a revenue law. It makes no discrimination between residents or products of Missouri and those of other States, and manifests no intention to interfere in any way with interstate commerce. Its object, in requiring peddlers to take out and pay for licenses, and to exhibit their licenses, on demand, to any peace officer, or to any citizen householder of the county, appears to have been to protect the citizens of the State against the cheats and frauds, and even thefts, which, as the experience of ages has shown, are likely to attend itinerant and irresponsible peddling from place to place and from door to door. * * * The necessary conclusion, upon authority, as well as upon principle, is that the statute of Missouri, now in question, is nowise repugnant to the power of Congress to regulate commerce among the several States, but is a valid exercise of the power of the State over persons and business within its borders."

It is true, in that case the vendor carried the machines with him from place to place, and made deliveries as he sold them. But we can not see that that alters the principle, for the Legislature has the power to define the act of peddling, and that definition should be upheld by the courts unless it is manifestly evasive.

The other decisions of the Supreme Court of the United States which are relied on by counsel do not conflict with the case above cited. *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, and the line of similar cases in that court, concerned statutes and ordinances imposing license fees on drummers who solicited orders for nonresident merchants, and such legislation was declared to be a burden on interstate commerce. Here, no such burden is imposed, for the license is not demanded merely for soliciting orders, but for peddling.

*Leisy* v. *Hardin*, 135 U. S. 100, arose under a statute of Iowa prohibiting the sale of intoxicating liquors without license. That was before the passage of the act of Congress known as the Wilson Act, and the court held that the imposition of a license fee on the sale of liquor was a burden on interstate commerce insofar as it applied to imported goods sold in original packages. The present statute, as we have already stated, does not require a

license merely to sell, but the license is required to peddle or sell by traveling from place to place over and through the county.

Caldwell v. North Carolina, 187 U. S. 622, is along the same line, for the ordinance found to be repugnant to the Federal Constitution prohibited the sale and delivery of certain wares (pictures and picture frames) in any manner without procuring license.

In Rearick v. Pennsylvania, 203 U. S. 507, the vendor's agent solicited orders for wares to be shipped into the State from Ohio, and the same were by the vendor in that State appropriated to the fulfillment of the contract of sale, and properly tagged and shipped into the State for delivery to the purchaser. In the present case the ranges were not separately appropriated to the filling of any particular order. The ranges were not separated and tagged with the name of any purchaser, but the appropriation was made by the agent of the vendor after the goods came into the State. Moreover, the court in that case seems to have treated the condemned ordinance as merely requiring a license for the sale of goods, and not as one requiring license for peddling, though the ordinance could be construed as applying only to peddlers or street vendors.

We discover no conflict between that decision and the decision in Emert v. Missouri, supra, which we think announces the law of the present case.

Both appellants were properly convicted, and the judgments against them are affirmed.

BATTLE, J., (dissenting). Where property in one State is bargained, sold or exchanged by a citizen or corporation of that State to or with a citizen of another, and in the consummation of such transaction is shipped to the other State to the person to whom it has been bargained, sold or exchanged, and reaches its destination, and becomes a part of the general mass of the property of the State to which it is shipped, it becomes subject to taxation in that State.

It was held in American Steel & Wire Company v. Speed, 192 U. S. 500, that "goods brought in original packages from another State, after they have arrived at their destination and are at rest within the State, and are enjoying the protection

which the laws of the State afford, may, without violating the commerce clause of the Constitution, be taxed, without discrimination, like other property within the State." *Woodruff* v. *Parham,* 8 Wall. 123; *Brown* v. *Houston,* 114 U. S. 622; *Emert* v. *Missouri,* 156 U. S. 296.

In *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, it is said: "As soon as the goods are in the State and become part of its general mass of property, they will become liable to be taxed in the same manner as other property of similar character, as was distinctly held in the case of *Brown* v. *Houston,* 114 U. S. 622. When goods are sent from one State to another for sale, or, in consequence of a sale, they become a part of its general property and amenable to its laws; provided no discrimination be made against them as goods from another State, but only taxed in the usual way as other goods are. *Brown* v. *Houston, supra; Machine Co.* v. *Gage,* 100 U. S. 676. But to tax the sale of such goods, or to offer to sell them, before they are brought into the State, is a very different thing, and seems to us clearly a tax on interstate commerce itself."

In *Brown* v. *Maryland,* 12 Wheaton 419, 441, Mr. Chief Justice Marshall, speaking for the court, said: "It is sufficient for the present to say, generally, that when the importer has so acted upon the thing imported that it has become incorporated and mixed up with the mass of property in the country, it has perhaps lost its distinctive character as an import, and has become subject to the taxing power of the State; but while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it is too plainly a duty on imports to escape the prohibition in the Constitution."

In *Leisy* v. *Hardin,* 135 U. S. 100, 110, it is said: "The point of time when the prohibition ceases and the power of the State to tax commences is not the instant when the article enters the country, but when the importer has so acted upon it that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands; that the distinction is obvious between a tax which intercepts the import as an import on its way to become incorporated with the general mass of

property and a tax which finds the article already incorporated with that mass by the importer."

In *Emert* v. *Missouri*, 156 U. S. 296, 311, cited in the opinion of this court in this case, the goods for to sell which the peddler was required to pay a license, were a part of the general mass of the property of the State. The court said: "The defendants's occupation was offering for sale and selling sewing machines by going from place to place in the State of Missouri, without a license. There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time. His dealings were neither accompanied nor followed by any transfer of goods, or of any order for their transfer, from one to another; and were neither interstate commerce in themselves, nor were they in any way directly connected with such commerce. The only business or commerce in which he was engaged was internal and domestic; and, so far as appears, the only goods in which he was dealing had become part of the mass of property within the State. Both the occupation and the goods, therefore, were subject to the taxing power, and to the police power, of the State.

In *Brown* v. *Houston*, 114 U. S. 622, 632, 634, it was held: "Coal mined in Pennsylvania and sent by water to New Orleans, to be sold in open market there on account of the owners in Pennsylvania, becomes intermingled, on arrival there, with the general property in the State of Louisiana, and is subject to taxation under the general laws of that State, although it may be, after arrival, sold from the vessel on which the transportation was made, and without being landed, and for the purpose of being taken out of the country on a vessel bound to a foreign port."

In speaking of the tax in that case the court said: "It was not a tax imposed upon the coal as a foreign product, or as the product of another State than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a State of transit through that State to some other place of destination. It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans. It might continue in that condition for a year or

two years. It had become a part of the general mass of property in the State, and as such it was taxed for the current year, as all other property in the city of New Orleans was taxed. * * * It was subject to no discrimination in favor of goods which were the product of Louisiana, or goods which were the property of citizens of Louisiana. It was treated in exactly the manner as such goods were treated."

In the same case the court said: "We do not mean to say that, if a tax collector should be stationed at every ferry and railroad depot in the city of New York, charged with the duty of collecting a tax on every wagon load, or car load of produce and merchandise brought into the city, that it would not be a regulation of and restraint upon interstate commerce, so far as the tax should be imposed on articles brought from other States. We think it would be; and that it would be an encroachment upon the exclusive powers of Congress. It would be very different from the tax laid on auction sales of all property indiscriminately, as in the case of *Woodruff* v. *Parham,* which had no relation to the movement of goods from one State to another. It would be very different from a tax laid, as in the present case, on property which had reached its destination, and had become part of the general mass of property of the city, and which was only taxed as a part of that general mass in common with all other property in the city and in precisely the same manner."

But property in one State, bargained, sold or exchanged by a citizen or corporation of that State to or with a citizen of another, and in the consummation of that transaction shipped to the other State to be delivered to the person to whom it was bargained, sold or exchanged, while in transit, before it reaches its destination, before it comes to a rest, or becomes a part of the general mass of the property of the State to which it is shipped, is a part of the interstate commerce of the country, and, under the commerce clause of the Constitution of the United States, is subject to the exclusive control of Congress.

In *Brennan* v. *Titusville,* 163 U. S. 289, it was held: "An ordinance requiring agents soliciting orders on behalf of manufacturers of goods to take out a license and pay a tax therefor, made by a municipal corporation under authority conferred by a statute of the State, granting to such corporations power

to levy and collect license taxes on hawkers, peddlers and merchants of all kinds, is an exercise, not of the police power, but of the taxing power; and when it is enforced against an agent sent by a manufacturer of goods in another State to solicit orders for the products of his manufactory, it imposes a tax upon interstate commerce, in violation of the provisions of the Constitution of the United States."

To the same effect it has been held in *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 494; *Brown* v. *Maryland*, 12 Wheat. 419, 444; *Asher* v. *Texas*, 128 U. S. 129; *Stoutenburgh* v. *Hennick*, 129 U. S. 141; *Crutcher* v. *Kentucky*, 141 U. S. 47, 61; *Stockard* v. *Morgan*, 185 U. S. 27, 37; *Caldwell* v. *North Carolina*, 187 U. S. 622; *Rearick* v. *Pennsylvania*, 203 U. S. 507; *Wrought Iron Range Co.* v. *Campen*, 47 S. E. 658; *Gunn* v. *White Sewing Machine Co.*, 57 Ark. 24.

The negotiation of sales of goods which are in another State, for the purpose of introducing them into the State in which the negotiation is made, is interstate commerce." *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497.

"It is settled that nothing which is a direct burden upon interstate commerce can be imposed by the State without the assent of Congress, and that the silence of Congress in respect to any matter of interstate commerce is equivalent to a declaration on its part that it should be absolutely free." *Brennan* v. *Titusville*, 153 U. S. 289, 302; *Brown* v. *Houston*, 114 U. S. 622; *Leisy* v. *Hardin*, 135 U. S. 100, 109, 113, 114, 123 and 124; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 493.

In *Lyng* v. *Michigan*, 135 U. S. 161, 166, it is said: "We have repeatedly held that no State has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the reason that such taxation is a burden on that commerce, and amounts to a regulation of it, which belongs solely to Congress."

The facts in this case are briefly as follows: The Wrought Iron Range Company, a corporation organized under the laws of the State of Missouri, manufactures ranges at its factory in the city of St. Louis, in that State. It has a division superintendent in this State, who looks after and superintends its

business in Union and other counties of the State. It has also salesmen and deliverymen. Each of the salesmen is furnished by it with a sample range, sample wagon and team, and is sent into such territory in Union or other counties as may be designated by the division superintendent, to solicit orders for ranges, manufactured by the company, similar to the sample range furnished him. When he secures an order, the purchaser executes his note for the same, which contains an express stipulation that it shall be void in the event the company fails to deliver the range so ordered within sixty days from date, thereby making the order subject to the approval of the company. Such orders are forwarded by the salesmen to the division superintendent, who investigates the credit of the purchaser, and, if found satisfactory, proceeds to have the order filled within the sixty days. In no case is the salesman allowed to sell the sample range entrusted to him. When the ranges ordered are received, they are delivered to the purchasers by the deliverymen. All money and notes, in excess of the amount necessary to pay expenses, are sent by the division superintendent to the company.

The ranges until sold and delivered form no part of the general mass of property of this State, are not subject to the jurisdiction of this State, and are not subject to taxation in the same. The solicitations of the salesmen, the orders of the purchasers and the sales of the ranges are transactions between citizens of two States, and are obviously interstate commerce. The requirement by the statute of April 1, 1909, of the company's employees (if it refers to them) to pay a license fee and to take out a license is a tax on the ranges while subjects of interstate commerce, and is a regulation of interstate commerce, and as to such persons is of no effect and null and void. *Brennan* v. *Titusville,* 153 U. S. 289, 298, 303; *Stockard* v. *Morgan,* 185 U. S. 27, 37; *Brown* v. *Maryland,* 12 Wheat. 419, 444, 447, 448.

WOOD, J., concurs with me in this opinion.